# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

WILLIAM N. JORDAN,

      Plaintiff,

      v.

CITY OF WAYCROSS, GEORGIA;
DAVID E. EDDINS, fire chief for
the city of Waycross, Georgia,
in his individual and official
capacities; TRINIJA MOLINA-
MARTIN, individually and in her
official capacity as director
of human resources and risk
management of the city of
Waycross, Georgia; and RAPHEL
MADDOX, individually and in his
official capacity as city
manager of the city of
Waycross, Georgia,

      Defendants.

No. 5:17-cv-33

## ORDER

This Matter comes before the Court on the summary judgment motion of Defendants City of Waycross ("the City"), David E. Eddins, Trinija Molina-Martin, and Raphel Maddox. Dkt. No. 25. This Motion has been fully briefed and is ripe for review. For the following reasons, this Motion is **GRANTED** in part and **DENIED** in part.

**BACKGROUND**

Plaintiff William Jordan joined the Waycross Fire Department as a firefighter in 1987. Defendants' Statement of Material Facts Not in Dispute ¶ 1 ("SUMF"), Dkt. No. 25-1;[1] Dkt. No. 26 at 13. Defendant Eddins, at the times relevant to this lawsuit, is the Fire Chief for the City of Waycross, having assumed the position in March 2008. SUMF ¶ 13; Dkt. No. 28 at 10-11. Defendant Maddox was the City Manager since 2013 and the Human Resources Director before that. SUMF ¶ 79; Dkt. No. 29 at 28. Defendant Martin has been the Human Resources Director since December 2014. SUMF ¶ 79; Dkt. No. 30 at 6.

In the early morning hours of December 15, 2013, City of Waycross firefighters responded to a house fire ("the Fire") in a condemned building on Isabella Street in Waycross. SUMF ¶ 33; Dkt. No. 26 at 57-59; Dkt. No. 28 at 125-26. The parties dispute whether and for how long some supervising firefighters on the scene may have believed that somebody was in the building, but ultimately it was determined that nobody was inside. SUMF ¶ 36; Dkt. No. 39-1 at 50-51; Dkt. No. 28 at 185-87. At some point, one of the firefighters inside the condemned building, Robert Sumerall, was ordered from the back of the house to the front of the house in order to "salvage and

---

[1] Throughout this order, the Court cites only those paragraphs from Defendants' SUMF which Plaintiff explicitly admits.

AO 72A
(Rev. 8/82)

overhaul." Dkt. No. 28 at 146; Dkt. No. 39-1 at 62, 63, 70-71. Sumerall thought this a strange order because "you don't salvage and overhaul mode unless you're in a residential structure, not a condemned structure." Dkt. No. 39-1 at 62.

In response to Eddins's "salvage and overhaul" order, Lieutenant Little and his crew entered the building. Id. at 73. Shortly thereafter, the ceiling collapsed. Id.; Dkt. No. 28 at 164, 171. Then Plaintiff arrived on the scene. SUMF ¶ 38; Dkt. No. 28 at 161-62. He rushed into the building to help extricate the trapped Lieutenant Little. SUMF ¶ 38; Dkt. No. 26 at 67. The firefighters successfully pulled Little out of the building, but he lost his life shortly thereafter. Summerall testified that Eddins apologized on the scene, prayed for Little to survive, and sought forgiveness from the other firefighters. Dkt. No. 39-1 at 81-82. Eddins denies making such an apology. Dkt. No. 28 at 185.

In the aftermath of the Fire and Little's death, many began to blame Eddins for Little's death. Jordan testified that firefighters at the scene "were all up in a rage" about Little's death and Eddins's role in it by ordering firefighters into a building with nobody in it. Dkt. No. 26 at 94. And Jordan himself began to voice this sentiment. He complained to his direct supervisor the first working day after the Fire. Id. at 95. He complained to Battalion Chief James Brown at Little's

funeral. Id. at 96. He testified that this sentiment was shared and voiced at the firehouse for a couple months. Id. at 94, 97.

Plaintiff asserts that Eddins's ordering Little into an empty condemned building violated then existing firefighting policy. Summerall testified that the policy was "You don't go inside no condemned building that bad." Dkt. No. 39-1 at 85-86. And a year later, Eddins issued a new policy providing:

> (1) We will risk our lives a lot, in a calculated manner, to save SAVABLE lives.
>
> (2) We will risk our lives a LITTLE, in a calculated manner, to save SAVABLE property.
>
> (3) We WILL NOT risk our lives at all for a building or lives that are already lost.
>
> Dkt. No. 40-9 (emphasis in original).

The complaints in the aftermath of the Fire prompted Eddins to send an interoffice memorandum on December 30, 2013 (two weeks after the Fire), entitled "Rumors and Opinions" that stated:

> In the last few days I have been hearing about different rumors and opinions being floated around the department concerning the fire on Isabella Street and the devastating death of Lt. Little. There is no doubt that this has sent shockwaves throughout the department and created a lot of concern and confusion, that is only natural. I wished I had answers to give each of you but I do not. However, I will not sit idly by and let

anyone give false information, spread harmful rumors, state unfounded and harmful opinions . or make any statements that are totally out of line. This is to stop Immediately.

The National Institute for Occupational Safety and Health (NIOSH) will be coming to Waycross to investigate the fire. Based on their findings they will provide recommendations.
Dkt. No. 40-7.

True to his word, multiple investigations began. The Waycross Fire Department Fire Marshall, the State Fire Marshal's Office, NIOSH, and the Waycross Police Department were all involved. SUMF ¶ 41; Dkt. No. 31 at 4, 40; Dkt. No. 26 at 77-78; Dkt. No. 31 at 8, 41-42.

Then Jordan's complaints about the circumstances surrounding Little's death expanded outside of the fire department. He contacted the Bureau of Alcohol, Tobacco, and Firearms and James Atkins, the local arson investigator with the state fire marshal's office, in March 2015, Gordon Henderson, Director of Georgia Firefighters Standards & Training Council in April 2015, the Governor of Georgia in May 2015, and the United States Department of Justice in May or June 2015. Id. at 98-100, 114-15. He also unsuccessfully attempted to contact Ralph Hudgens, the Georgia Insurance Commissioner, in July or August 2015. Id. at 165-67; SUMF ¶ 77. Plaintiff also contacted Little's widow and urged her to file a lawsuit. SUMF ¶ 78.

AO 72A
(Rev. 8/82)

The record contains a factual dispute as to whether Martin and Eddins had knowledge that Plaintiff made these complaints. Investigator Atkins testified that he never called Eddins to tell him Plaintiff had complained. Dkt. No. 31 at 28. On the other hand, Henderson testified that he informed Eddins that "someone" had complained. Dkt. No. 36 at 51, 81. Jordan had previously complained to Eddins about not being able to attend an interview with an investigator from NIOSH. Dkt. No. 26 at 90. Eddins and Martin knew of Little's wife's lawsuit against Eddins, which named Jordan in the pleadings and alleged that Eddins "fraudulently kept those involved in the fire from speaking publically about the fire." Dkt. No. 40, Ex. 39; Dkt. No. 30 at 99; Dkt. No. 29 at 14-15. A member of the Waycross Fire Department testified that complaints about the Fire were "common knowledge" at the firehouse. Dkt. No. 33 at 7.

Plaintiff injured his shoulder when extricating Little from the Fire. SUMF ¶ 66; Dkt. No. 26 at 115-16. He continued working until he began medical leave on March 18, 2015, in order to undergo surgery. SUMF ¶ 67; Dkt. No. 28 at 220; Dkt. No. 26 at 118. On June 16, 2015, Eddins asked Martin whether Plaintiff would be absent from work much longer because, if so, then Eddins needed to report Plaintiff's absence to Standards & Training. SUMF ¶ 89; Dkt. No. 28 at 278-73. Plaintiff's medical leave lasted about a year—he returned to work without

restrictions on March 29, 2016. SUMF ¶ 91; Dkt. No. 26-18. The leave would have lasted <u>exactly</u> one year—Plaintiff's doctor was prepared to release him on March 18, 2016, but substituted the March 29 date after Plaintiff explained that he could not begin in the middle of a pay period. SUMF ¶ 92; Dkt. No. 26 at 120. (As it turns out, the City does not require an employee's start date to correspond with pay periods. SUMF ¶ 93; Dkt. No. 30 at 54, 106-07.)

Eddins learned on March 24 that Plaintiff would be returning on March 29. SUMF ¶ 94; Dkt. No. 28 at 231. He (Eddins) called HR Director Martin to discuss the training requirements that Jordan must satisfy after returning to work following an extended absence. Dkt. No. 28 at 231. Henderson testified that the Standards & Training regulations require a firefighter to retake the basic Firefighter I test following a leave exceeding 365 days. Dkt. No. 36. The first available test date for Plaintiff was March 31. Dkt. No. 30 at 50.

Jordan started back to work on March 29. It was on that day that he learned of the retest requirement. (However, Defendants assert that this information was available online. SUMF ¶ 98.) In any event, nobody had warned Jordan that he needed to be recertified. SUMF ¶ 99; Dkt. No. 30 at 83.

On that first day of Plaintiff's return to work, Plaintiff had an 8:00a.m. meeting with Eddins, Martin, and Nicole Price,

another employee of the City of Waycross. Dkt. No. 28 at 231. There, Martin presented Jordan with a letter ("the Letter"), which read, in pertinent part:

> We have been advised that your medical leave of absence which began 3/19/2015 through 3/28/2016 has caused your firefighter certification to lapse. You will be given an opportunity to retake the basic Firefighter I written exam and the requisite remedial training required to have your state firefighter certification reinstated and subsequently be restored to your previous position of certified firefighter. Your written exam is scheduled for Thursday, March 31, 2016, at the GFSTC Office in Forsyth, GA. This is the only test date you will be given; I encourage you to do your best.
> Dkt. No. 40-1.

Also at the meeting, Jordan was informed that he would be "temporarily reassigned" to the Community Improvement Department (one of eight departments within the City of Waycross) until his test results were received. Id.; Dkt. No. 30 at 27. Martin asked Plaintiff to sign the Letter, but Plaintiff declined, choosing not to accept the reassignment or the recertification requirement. SUMF ¶ 115; Dkt. No. 26 at 158. Plaintiff explained that he couldn't sign anything until his lawyer reviewed it. Dkt. No. 26 at 127. Plaintiff was told that his refusal to sign the Letter would be considered a voluntary resignation. Dkt. No. 30 at 78. Martin typed "REFUSED TO SIGN" on the Letter and began preparing Plaintiff's separation package. SUMF ¶ 127; Dkt. No. 30 at 79, 89, 97-98. Martin then informed Maddox of the happenings at the Meeting. SUMF ¶ 128;

Dkt. No. 30 at 89-90. The City considered Plaintiff's refusal to sign the Letter to be a voluntary resignation. City employees have no ability to appeal a separation resulting from a voluntary resignation. Dkt. No. 30 at 93. This Meeting lasted about thirty-five minutes. Dkt. No. 26 at 122.

Following the Meeting, Plaintiff contacted an attorney (Deen Strickland) who had represented him in a previous matter. SUMF ¶¶ 130, 131; Dkt. No. 26 at 122. Although Strickland was in court that day, he told his office to "tell Mr. Jordan to please let him have an opportunity for me to look at [the Letter] before he signed it." Dkt. No. 34 at 3. Later that afternoon, Strickland spoke directly to Jordan, reviewed the Letter, and advised Jordan to sign it in the morning. Id.

Plaintiff also contacted individuals at Standards & Training and confirmed that he really did need to be recertified. SUMF ¶ 142; Dkt. No. 26, Ex. 22. The day after the Meeting (March 30), Plaintiff called in sick. Dkt. No. 26 at 122-28.[2] He also called Eddins and explained that he had not refused to sign the Letter the day before but simply sought to speak with his attorney first. SUMF ¶ 137; Dkt. No. 28 at 248. At some point (the record does not provide a date), Plaintiff contacted Martin, informing her that he wanted to sign the

---

[2] There is some lack of clarity regarding whether Plaintiff had a scheduled surgery at that time, but it is not material to the present dispute.

Letter and return to work, but she told him that his resignation had already been accepted. SUMF ¶ 140; Dkt. No. 30 at 126.

A few days later, on April 1, 2016, Strickland contacted the City Attorney about appealing any adverse action against Plaintiff. SUMF ¶ 143; Dkt. No. 26 at 133-34. The City Attorney explained that a voluntary resignation is not appealable. SUMF ¶ 144; Dkt. No. 34 at 19. Strickland asked if an exception could be made for Plaintiff. SUMF ¶ 145; Dkt. No. 34 at 21. Maddox responded that he doubted it, because of Plaintiff's history of a troubled relationship with the City. Id. (Previously, Plaintiff had filed grievances against supervisors, suffered various adverse actions, and been convicted of minor criminal charges. See Dkt. No. 26 at 21-23, 24, 27-28.)

Plaintiff filed the present lawsuit against the City of Waycross, Eddins, Martin, and Maddox, alleging claims for violation of the Georgia Whistleblower Act, First Amendment retaliation, violation of substantive due process, and violation of procedural due process. Dkt. No. 1.

### LEGAL STANDARD

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the

outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

The nonmovant may satisfy this burden in one of two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an

11

absence of evidence." <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting <u>Celotex Corp.</u>, 477 U.S. at 332 (Brennan, J., dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." <u>Id.</u> at 1117. Where the nonmovant attempts to carry this burden instead with nothing more "than a repetition of his conclusional allegations, summary judgment for the defendants [is] not only proper but required." <u>Morris v. Ross</u>, 663 F.2d 1032, 1033-34 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)).

## DISCUSSION

Defendants raise several grounds for summary judgment. First, they seek dismissal of the official capacity claims against the individual defendants. Second, they argue that Maddox and the City cannot be liable under respondeat superior. Third, they argue that they are entitled to qualified immunity on each constitutional claim. Fourth, they argue that Plaintiff's whistleblower claim must fail because he never alleged a specific law that Eddins violated. The Court will take up each in turn.

### I. Official Capacity claims against individual Defendants

Defendants Martin, Maddox, and Eddins move for summary judgment on the official capacity claims against them because of

their redundancy with the claims against the City of Waycross. Plaintiff responds that "[t]his is a correct statement of law." Dkt. No. 41 at 16. The parties are right.

"For liability purposes, a suit against a public official in his official capacity is considered a suit against the local government entity he represents." Owens v . Fulton Cnty., 877 F.2d 947, 952 n.5 (11th Cir. 1989) (citing Kentucky v. Graham, 473 U.S. 159, 166 (1985)). The presence of both claims is "redundant and possibly confusing to the jury." Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991). Therefore, Defendants' motion for summary judgment on the official capacity claims is **GRANTED**.

## II. **Respondeat Superior Claims against Maddox and the City of Waycross**

Defendants Maddox and the City of Waycross argue that they cannot be held liable under a theory of respondeat superior. Plaintiff responds, in effect, that he is not seeking to hold them liable on such a basis but, rather, for their final policymaking authority.

To begin, the parties are right that respondeat superior liability does not apply to § 1983 claims. See Oladeinde v. City of Birmingham, 230 F.3d 1275, 1295 (11th Cir. 2000) ("A city or local government agency 'may not be held liable for constitutional deprivations on the theory of respondeat

superior.'") (quoting <u>Denno v. School Bd. of Volusia Cnty.</u>, 218 F.3d 1267, 1276 (11th Cir. 2000)). Instead, "to impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." <u>McDowell v. Brown</u>, 392 F.3d 1283, 1289 (11th Cir. 2004). And, "a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." <u>McDowell</u>, 392 F.3d at 1290. Similarly, the "supervisory officials can be liable [only] if they personally participate in the alleged constitutional violation or where there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." This can be established when the supervisor's improper custom or policy results in deliberate indifference to constitutional rights." <u>Id.</u> "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality. A custom is a practice that is so settled and permanent that it takes on the force of law." <u>Sewell v. Town of Lake Hamilton</u>, 117 F.3d 488, 489 (11th Cir. 1997) (citations omitted). In § 1983 employment

cases, "[m]unicipality liability may arise with regards to an employment decision, such as a termination, provided that the decision maker 'possesses final authority to establish municipal policy with respect to the action ordered.'" Quinn v. Monroe Cty., 330 F.3d 1320, 1325 (11th Cir. 2003) (emphasis omitted) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)).

So-did the person who effected Plaintiff's resignation have final authority to establish the City's position as to that resignation? Martin was the one who wrote "REFUSED TO SIGN" and characterized that refusal as a voluntary resignation. Maddox and Eddins testified that the human resources director (i.e., Martin) makes that final determination. Dkt. No. 29 at 9; Dkt. No. 28 236, 251. No record evidence suggests anything to the contrary. Additionally, in this case, the City's own policy had a role in the relevant adverse action: it is the City's policy that employees cannot appeal "voluntary resignations." That presents evidence, sufficient to withstand summary judgment, that the City is a proper defendant in a § 1983 employment claim.

On the subject of supervisor liability, Maddox asserts that he did not participate in the meeting with Plaintiff regarding his temporary reassignment and was not involved in the decision to accept Plaintiff's resignation. His testimony is that he is

15

only involved in decisions concerning separation from employment when an employee appeals. Dkt. No. 29 at 15-16, 19. But the record does not establish as a matter of law that Maddox had no involvement in hiring and firing decisions. While Martin testified that department managers (i.e., Eddins) had authority for hiring decisions with the support of Human Resources (i.e., Martin), Eddins testified that his process was to make recommendations for such decisions to the city manager (i.e., Maddox). Compare Dkt. No. 30, 32-33 with Dkt. No. 28, 285.

And the record shows some involvement by Maddox in this particular case. Specifically, Plaintiff's attorney contacted Maddox in an attempt to appeal the separation and explicitly asked Maddox to make an exception allowing Plaintiff to appeal. For these reasons, the facts viewed in the light most favorable to Jordan establish that Maddox's role in the adverse action was not limited to that of a supervisor without direct involvement.

In conclusion, Maddox and the City's "point" that they cannot be liable under a theory of respondeat superior is well-taken, but there are no claims Plaintiff has raised that strictly base liability on that theory.

## III. Qualified Immunity

Qualified immunity protects government officials acting in their discretionary authority from liability unless they violated "clearly established statutory or constitutional rights

of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). In the context of qualified immunity, discretionary authority is defined more broadly than requiring the exercise of independent judgment but asks whether the government employee was (a) performing a legitimate job-related function (b) through means that were within his power to utilize. <u>Holloman ex rel. Holloman v. Harland</u>, 370 F.3d 1252, 1265 (11th Cir. 2004). "A government official acts within his or her discretionary authority if objective circumstances compel the conclusion that challenged actions occurred in the performance of the official's duties and within the scope of this authority." <u>Hill v. Dekalb Reg'l Youth Det. Ctr.</u>, 40 F.3d 1176, 1185 n.17 (11th Cir. 1994). "[T]he inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act." <u>Harbert Int'l, Inc. v. James</u>, 157 F.3d 1271, 1282 (11th Cir. 1998). So, "to pass the first step of the discretionary function test for qualified immunity, the defendant must have been performing a function that, but for the alleged constitutional infirmity, would have fallen within his legitimate job description." <u>Holloman</u>, 370 F.3d at 1266.

Here, the actions in question are discussing an employee's return to work, implementing certification requirements, and accepting a resignation. The first question regarding

17

discretionary authority is whether these actions were legitimate job-related functions of Martin and Eddins. Plaintiff does not contest that these were job-related functions, and they were. These actions fall under the duties of a human resources director and the fire chief.

It is the second prong of the discretionary authority test that Plaintiff contests. This prong asks whether Defendants performed their duties through means that were within their power. Plaintiff asserts that none of these Defendants had the power to transfer Plaintiff from one department to another or to unilaterally make a determination that an employee had voluntarily resigned instead of being terminated. In support of this assertion, Plaintiff points to the lack of a written policy explicitly allowing reassignment of employees from one department to another or unilateral decisions that an employee had resigned. Dkt. No. 41 at 19 (citing Dkt. No. 30 at 68).

Plaintiff's identification of the job powers at issue parses too finely the relevant actions. An action need not be taken pursuant to a stated written policy in order to be "discretionary." Whether Defendants took the _right_ actions has no bearing on whether they had _authority_ to take those actions. Meeting with an employee about his return to work, reassigning to a different department within the City, arranging recertification, and accepting a resignation were within the

AO 72A
(Rev. 8/82)

powers of the human resources director and the fire chief—that is, the powers of Martin and Eddins. Thus, Defendants were acting within their discretionary authority. Therefore, they are entitled to qualified immunity unless they violated clearly established constitutional rights. As discussed below, Defendants are entitled to summary judgment on the Substantive Due Process claims; however, material factual disputes surround the remaining federal claims such that summary judgment is not proper—that is, if a finder of fact were to resolve the factual disputes in favor of Plaintiff, clearly established law would have been violated.

### A. Substantive Due Process

Defendants argue that the actions Plaintiff complains of in this suit are not protected by the Substantive Due Process Clause. They are right. The Eleventh Circuit has held that "an employee with a property right in employment is protected only by the procedural component of the Due Process Clause, not its substantive component." McKinney v. Pate, 20 F.3d 1550, 1560 (11th Cir. 1994). And Plaintiff's response essentially concedes as much. See Dkt. No. 41 at 20-21 (conceding that the Eleventh Circuit evaluates similar claims as procedural due process claims).

Therefore, the Court **GRANTS** summary judgment to Defendants on Plaintiff's Substantive Due Process claims.

## B. Procedural Due Process

Defendants argue that Plaintiff's Procedural Due Process Claim must fail because he voluntarily resigned. It is true that if the end of Plaintiff's employment relationship with the City of Waycross is properly deemed a "voluntary resignation," then he cannot find protection in the Due Process Clause. See Hargray v. City of Hallandale, 57 F.3d 1560, 1567 (11th Cir. 1995) (When an employee voluntarily resigns, "he relinquished his property interest voluntarily and thus cannot establish that [he was deprived] of it within the meaning of the due process clause.")

"As an initial matter, employee resignations are presumed to be voluntary. This presumption will prevail unless [the employee] comes forward with sufficient evidence to establish that the resignation was involuntarily extracted." Id. at 1568. The inquiry is whether the employee was exercising free choice. Id. Factors the Eleventh Circuit has used to examine whether a resignation was voluntary include: (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice; (3) whether the employee was given a reasonable time; (4) whether the employee was permitted to select the effective date; and (5) whether the employee had the advice of counsel. Id.

Here, though, the question is even more nuanced than whether a resignation was voluntary; the question is whether Plaintiff resigned at all. Here, Plaintiff showed up to an 8:00a.m. meeting on his first day back to work after a year-long absence. At the meeting he was told that he needed to be recertified in order to remain in his current position. He was told that he would take the recertification test in two days' time at a location three hours away, in Forsyth, GA. In the meantime, he would be temporarily reassigned to a different department. Plaintiff did not expect to hear this news on his first day back, and he did not understand why he needed to be recertified, believing that his training hours were current. Martin instructed him to sign the Letter, signifying these changes to his employment status. Jordan was given thirty-five minutes to decide whether to do so. He did not have the advice of counsel when making this decision, despite having requested it. He decided not to sign the Letter. Martin told him that failing to sign the Letter would be considered a "voluntary resignation."

After speaking with an attorney the next day, Jordan contacted Martin again, indicating his desire to return to work and sign the Letter. Too late, his supervisors informed him; his resignation had already been accepted, and there was no appeals process.

With these facts, the Court is not convinced that Jordan resigned at all. At the very least, a reasonable jury could find that his resignation was not voluntary. Jordan's alternative to resignation, in his mind, was to fail a test because of insufficient notice and time to prepare and thus be terminated. He did not understand, at the Meeting, that Martin was correct about Jordan's need to take a recertification test, having never needed to do so in thirty years as a firefighter. Jordan was given a mere half hour to make his decision. He did not have the advice of counsel, despite requesting it, and he did not decide the effective date of his "voluntary resignation." The involuntariness of the "resignation" is further supported by his strong desire to sign the Letter, once he had time to confirm Martin's facts, reflect on his choice, and speak with an attorney.

For these reasons, Defendants' Motion for Summary Judgment on Plaintiff's Procedural Due Process claim is **DENIED**.

### C. First Amendment Retaliation Claim

"[A] public employee's right to freedom of speech is not absolute." Bryson v. City of Waycross, 888 F.2d 1562, 1565 (11th Cir. 1989). "The state has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Rankin v. McPherson, 483

AO 72A
(Rev. 8/82)

U.S. 378 (1987) (quoting Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)).

In First Amendment retaliation claims, the court should consider: (1) whether the employee's speech touches a matter of public concern; (2) the balance of the employee's First Amendment interests against the government's interests; (3) whether the employee can show the substantial role the employee's speech played in motivating the employment decision; and (4) whether the government can show that it would have reached the same decision based solely on a legitimate reason. Bryson, 888 F.2d at 1565-66.

Here, Defendants concede for the sake of argument that Plaintiff's speech touches a matter of public concern and has a greater interest in protection than the state's interest in quashing it. The real dispute lies in the causal link between Plaintiff's speech and the employment action—that is, the third and fourth factors.

To prove causation, a plaintiff must prove that his speech was the "but-for" cause of the allegedly retaliatory action. See Lozman v. City of Riviera Beach, 39 F. Supp. 3d 1392, 1405 (S.D. Fla. 2014) (citing Fairley v. Andrews, 578 F.3d 518 (7th Cir. 2009)). This may be established by proof of an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory act or a pattern of antagonism coupled

with timing. <u>Lozman</u>, 39 F. Supp. 3d at 1405 (citing <u>Lauren W.</u> <u>ex rel. Jean W. v. DeFlaminis</u>, 480 F.3d 259, 267 (3d Cir. 2007)). Ultimately, the plaintiff must show evidence from which a reasonable fact-finder viewing the record as a whole could infer causation. <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 281 (3d Cir. 2000).

Defendants assert that Plaintiff cannot establish the necessary causal link because neither Martin nor Eddins knew of Plaintiff's complaints to the various fire agencies and because too much time had elapsed (seven months) between the complaints and the acceptance of Plaintiff's resignation.

Plaintiff responds to Defendants' temporal proximity argument by pointing out that he was on medical leave from March 18, 2015 until March 29, 2016. Though at first blush it appears that the City delayed in acting out against him, its action was actually taken on Plaintiff's very first day back to work—what Plaintiff characterizes as "the first opportunity available." Dkt. No. 41 at 23.

Plaintiff responds to Defendants' arguments regarding lack of knowledge of Plaintiff's complaints by pointing to record evidence that calls that conclusion into doubt. Specifically:

- Eddins knew that "someone" had complained.

- Upset about not being able to discuss the Isabella Street Fire with the investigator, Plaintiff complained to Eddins about not being able to attend the interview.

- Eddins and the City were sued by Diane Little in an action related to the Fire. The pleadings in that case mentioned Plaintiff and alleged that Eddins kept those involved in the Fire from speaking about it.

- A member of the Waycross Fire Department testified that complaints at the Fire Department were "common knowledge" at the firehouse.

- Martin testified that she knew about the Little lawsuit before March 29, 2016.

- Maddox testified that he learned of the Little lawsuit around the time it was filed, and informed Eddins of it.

- Eddins issued the memorandum requiring firefighters not to talk about the Fire.

- Jordan complained at the firehouse, where Defendants worked, about the Defendants' actions at the Fire for several months.

Viewing all of these facts as a whole, the Court is satisfied that, at this stage of the case, Plaintiff has produced sufficient evidence from which a reasonable juror could

infer that his speech[3] was the but-for cause of the actions taken against him.

Next, the burden shifts to the City to produce evidence that it would have taken the same action for a legitimate reason. Defendants assert that Plaintiff's separation from employment resulted from a legitimate reason: he refused to take the required recertification test necessary to keep him qualified as a firefighter.

Perhaps, but the facts do not support such a simple conclusion as a matter of law. Defendants gave Plaintiff no warning prior to his return to work that he would need to retake the certification test. Defendants did not give Plaintiff an opportunity to verify with Standards & Training that recertification was required. Defendants told Plaintiff that he would only get one chance to take the test—and that that would occur three hours away, in two days' time, two days that Jordan would be required to be working in his new position. Other test dates were available, and Jordan was given no agency in choosing what test date would best fit his schedule and his ability to prepare.

---

[3] Note too that, for the purposes of the First Amendment retaliation claim, Defendants did not have to know that Plaintiff complained to specific agencies, just that he complained at all.

AO 72A
(Rev. 8/82)

Moreover, Defendants have articulated no legitimate reason why they failed to allow Plaintiff to comply with their wishes after he had had a chance to verify the recertification requirement and speak with an attorney—that is, they have stated no reason why the next day was too late to reverse the "voluntary resignation." They have offered no legitimate reason why Plaintiff was given only thirty-five minutes to make such an impactful employment decision or why they failed to honor his request to call his lawyer before signing it.

For these reasons, the Court is satisfied that Plaintiff has produce sufficient evidence at this stage of the case that his speech cause the adverse employment action. Therefore, Defendants' Motion for Summary Judgment on this claim is **DENIED**.

## IV.  Whistleblower Claim

Georgia's Whistleblower Act provides: "No public employer shall retaliate against a public employee for disclosing a violation of or noncompliance with a law, rule, or regulation to either a supervisor or a government agency, unless the disclosure was made with knowledge that the disclosure was false or with reckless disregard for its truth or falsity." O.C.G.A. § 45-1-4(d)(2). The language of the statute shows that a plaintiff need not be right that the defendant committed a violation, but he cannot find protection in the statute if his

disclosure was knowingly false (or made with reckless disregard for the truth).

Defendants argue that Plaintiff's whistleblower claim fails because Plaintiff's complaint concerned violations of firefighting policy, not unlawfulness. See Coward v. MCG Health, Inc., 802 S.E.2d 396 (Ga. Ct. App. 2017) ("Complaints arising under internal policies are not, however, the type of protected activity the Whistleblower Statute was intended to protect.") (finding no protected disclosure where the plaintiff had complained that insufficient nurse-to-patient ratios had contributed to a patient's attempted suicide).

In response, Plaintiff points to laws that prohibit the actions that he complained Eddins took on the night of the Fire. First, Plaintiff argues that his complaints about Eddins's behavior resulting in Little's death are addressed by O.C.G.A. § 34-7-20's requirement that employers warn employees of "dangers incident to employment." Second, Plaintiff points to O.C.G.A. § 16-5-40, prohibiting a gross deviation from a reasonable standard of care that causes bodily harm to another by consciously disregarding a substantial and unjustifiable risk that their actions would cause harm to that person.

The gist of Plaintiff's complaint has always been that Eddins's wrong decision to order firefighters into a condemned building led to the preventable death of Jeff Little—in short,

that Eddins was legally responsible for Little's death.   Dkt. No. 26 at 85, 94.   The Court has found no requirement under Georgia law that a whistleblower name the specific code section he feels the defendant violated when making his disclosure in order to win protection under Georgia's Whistleblower Statute. By complaining to law enforcement agencies that Eddins was legally responsible for Little's death, Plaintiff meets the definition of whistleblower under the Georgia statute. Therefore, Defendants' Motion for Summary Judgment on Plaintiff's whistleblower claim is **DENIED**.

## CONCLUSION

The summary judgment motion on the official capacity claims against Martin, Maddox, and Eddins is **GRANTED**.   The summary judgment motion against Maddox and the City of Waycross on all claims is **DENIED**.   The City's summary judgment motion on the Substantive Due Process claim is **GRANTED**.   The City's summary judgment motion on the Procedural Due Process claim is **DENIED**. The summary judgment motion on Plaintiff's First Amendment retaliation claim is **DENIED**.   The summary judgment motion on Plaintiff's claim under the Georgia Whistleblower Act is **DENIED**.

**SO ORDERED,** this 27th day of August, 2018.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA